# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>RICHARD CARL WYATT,<br><br>Defendant. | No. CR97-3015-LTS<br><br>**MEMORANDUM<br>OPINION AND ORDER** |

## I. INTRODUCTION

This case is before me on defendant Richard Carl Wyatt's motion (Doc. No. 83) for compassionate release. The Government has filed a response (Doc. No. 89) and Wyatt has filed a reply (Doc. No. 92). Oral argument is not necessary. *See* Local Rule 7(c).

## II. BACKGROUND

During September and October 1997, Wyatt robbed seven different banks in Iowa, Missouri, Nebraska and Wisconsin. Doc. No. 47 at ¶¶ 20–31. Wyatt would enter the bank, approach the teller and give him or her a note stating that he was robbing the bank and to give him cash. *Id.* The tellers would then do as they were told. *Id.* On two occasions, when the tellers were reluctant to comply, Wyatt lifted his shirt to show a handgun tucked in his waistband. *Id.* at ¶¶ 21, 30. On two other occasions, he told the teller that he had a gun but did not display it. *Id.* at ¶ 24, 25. Wyatt was arrested in November 1997. *Id.* at ¶ 17.

On February 20, 1998, a Superseding Indictment was returned by a Northern District of Iowa grand jury, charging Wyatt with three counts: (1) bank robbery in

violation of 18 U.S.C. § 2113(a), (d); (2) use of a firearm during a crime of violence in violation of 18 U.S.C. § 924(c)(1) and (3) felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g), 924(a)(2), (e). *Id.* at ¶¶ 1–4. Indictments were returned by other federal grand juries charging Wyatt for the bank robberies he committed in other districts: one count of bank robbery in the Southern District of Iowa, one count of bank robbery in the District of Nebraska, three counts of bank robbery in the Eastern District of Wisconsin and one count of bank robbery in the Western District of Missouri. *Id.* at ¶¶ 5–14. On April 28, 1999, Wyatt pleaded guilty to all counts. *Id.* at ¶ 15.

At Wyatt's sentencing hearing, conducted by United States District Judge Mark W. Bennett on October 28, 1999, the primary dispute was whether Wyatt should have received a two-level increase pursuant to U.S.S.G. § 3C1.1 for obstruction of justice. The Government presented witness testimony that Wyatt twice tried to escape from confinement while his case was pending. *See* Doc. No. 47 at ¶¶ 38–39. Wyatt testified as well, denying that he ever attempted to escape. Judge Bennett credited the Government's witnesses, imposed the two-level increase for obstruction of justice and denied any downward adjustment for acceptance of responsibility.

The Government also moved for an upward departure based on underrepresentation of Wyatt's criminal history. That criminal history includes convictions for interstate transportation of a stolen motor vehicle in 1964, uttering bad checks in 1966, obtaining money by false pretenses in 1969, carrying a concealed weapon in 1972, passing bad checks in 1972, stealing under $50 in 1973, impersonating a police officer in 1973, possession of a firearm by a convicted felon in 1973, defrauding an innkeeper in 1974, grand theft in 1975, impersonating a federal officer and conspiracy to impersonate a federal officer in 1975, robbery in 1980, bank robbery in 1980, bank larceny in 1988 and bank robbery in 1997. *Id.* at ¶¶ 104–118. Judge Bennett granted the motion and increased Wyatt's total offense level by one.

Judge Bennett ultimately calculated a sentencing guideline range of 292 to 365 months, based on a total offense level of 35 and a criminal history category VI. Judge Bennett sentenced Wyatt to the maximum sentence allowed by law, stating:

> You're just a career criminal. I don't know what else to tell you. Mr. Wyatt. And this is hard for me to do, but I'm going to give you the maximum statutory sentence I can on every count essentially and run some of it concurrent—I'm sorry, consecutive to get you to the top end of every guideline range which is going to be a 365-month sentence with a 60-month consecutive sentence on top of the gun count.
>
> And I look for ways to give people breaks. And I just can't find a way to give you any break in this case. I just think you've had a life—you're a life-long career criminal. Thank God you haven't injured anybody physically. But, you know, I'm sentencing you on, what, seven bank robberies, and you're serving time on another one.
>
> And Mr. Williams said something that I agree with. Most people, if you'd let them out when they're 70 or 75, you have no concern that they're going to commit crime. I'm concerned that you'd go out and you'd—I didn't necessarily believe your tale of gambling, but if it's true, you'd go out and you'd commit another bank robbery. And I haven't given—I've given a couple of life sentences, and I'm essentially giving you a life sentence, and I understand that. It weights very, very heavy with me; very hard thing for me to do personally, very hard thing for me to do as a federal district court judge. But you're a menace and a danger to society. And society's entitled to be protected from you.
>
> And so I'm going to give you the harshest, heaviest sentence that I can impose in this case, and it's fairly complicated. But it's my judgment that you're committed to the custody of the Bureau of Prisons to be imprisoned for 300 months on Count 1 in Criminal Number 99-3007, the Western District of Missouri. In addition, you are committed to the custody of the Bureau of Prisons to be imprisoned for 240 months on Count 1 in Criminal Number 99-3004 in the District of Nebraska; 240 months on Counts 1, 2, and 3 in Criminal Number 99-0008 in the Eastern District of Wisconsin; 240 months on Count 1 in Criminal Number 99-3005 in the Southern District of Iowa; 180 months on Count 3 in Criminal Number 97-3015 in the Northern District of Iowa to be served concurrent with Count 1 in Criminal Number 99-3007 in the Western District of Missouri.
>
> In order to get to the 365 months upward departure, I find that you are committed to the custody of the Bureau of Prisons to be imprisoned for 65

months on Count 1 in 97-3015 in the Northern District of Iowa to be served consecutive to all of the previously imposed sentences. The previously imposed sentences shall run concurrently with each other than the 65 months consecutive on 97-3015 in the Northern District of Iowa, and the sentences will be run concurrently with your imprisonment on 97-105 in the Western District of Wisconsin. On the 924(c) gun count, Count 2 in 97-3015 in the Northern District of Iowa, you're committed to the custody of the Bureau of Prisons to be imprisoned for 60 months to be served consecutive to all other counts and the term of imprisonment imposed in 97-105 from the Western District of Wisconsin.

I find that this harsh sentence is necessary to reflect the seriousness of your continued repeated violations of the federal criminal law and to provide adequate deterrence for your criminal conduct.

I will recommend that you serve your time at the facility in Leavenworth, Kansas. If you don't die in prison which I think is unlikely, if you're release from prison, you'll be placed on supervised release as follows: Five years each on Count 1 in 99-3007 and Count 1 in 97-3015 and three years on each of the remaining counts all to be run concurrently with each other.[1]

According to the online Bureau of Prisons (BOP) inmate locator, Wyatt is currently at Greenville FCI and his projected release date is August 3, 2029.

### III. COMPASSIONATE RELEASE STANDARDS

A court's ability to modify a sentence after it has been imposed is extremely limited. One way a court may modify a sentence is through "compassionate release" as outlined in 18 U.S.C. § 3582(c)(1)(A), which was recently modified by the First Step Act of 2018 (FSA). *See* Pub. L. No. 115-391, § 603. In the past, 18 U.S.C. § 3582(c)(1)(A) permitted a court to reduce a defendant's term of imprisonment only upon the motion of the Director of Bureau of Prisons (BOP). The FSA modified § 3582(c)(1)(A) such that a defendant may now directly petition the court "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the

---

[1] A copy of the official sentencing transcript was obtained from the court reporter. It is not available through the online docket given the age of this case.

receipt of such a request by the warden of the defendant's facility, whichever is earlier." *See Mohrbacher v. Ponce*, No. CV18-00513, 2019 WL 161727, at *1 (C.D. Cal. Jan. 10, 2019) (discussing modifications made to § 3582(c)(1)(A) by the FSA); *see also United States v. Perez-Asencio*, No. CR18-3611, 2019 WL 626175, at *2–3 (S.D. Cal. Feb. 14, 2019).

If a defendant fully exhausts administrative remedies, the court may, upon motion of the defendant, reduce the defendant's sentence, after considering the factors set forth in 18 U.S.C. § 3553(a) to the extent they are applicable, if the court finds that:

> (i) extraordinary and compelling reasons warrant such a reduction; or
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . .

18 U.S.C. § 3582(c)(1)(A). Wyatt does not meet the requirements of § 3582(c)(1)(A)(ii). He has not served at least 30 years in prison and was not sentenced pursuant to 18 U.S.C. § 3559(c) to life in prison. Accordingly, Wyatt's only possible avenue for relief is § 3582(c)(1)(A)(i).

The starting point in determining what constitutes "extraordinary and compelling reasons" under § 3582(c)(1)(A)(i) is the Sentencing Guideline discussing compassionate release issued by the United States Sentencing Commission. *See* U.S.S.G. § 1B1.13 (U.S. Sentencing Comm'n 2018); *see also United States v. Hall*, No. CR98-7, 2019 WL 6829951, at *3 (E.D. Ky. Dec. 13, 2019); *United States v. Rivernider*, No. CR10-222, 2019 WL 3816671, at *2 (D. Conn. Aug. 14, 2019). The Guideline provides that extraordinary and compelling reasons exist in the following circumstances:

> (A) Medical Condition of the Defendant.—

5

> (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
> (ii) The defendant is—
>
>> (I) suffering from a serious physical or medical condition,
>>
>> (II) suffering from a serious functional or cognitive impairment, or
>>
>> (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
>
> (B) Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.
>
> (C) Family Circumstances.—
>
>> (i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.
>>
>> (ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.
>
> (D) Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

U.S.S.G. § 1B1.13 cmt. n.1.

This Guideline predates the FSA and has "not been amended to reflect that, under the FSA, a defendant may now move for compassionate release after exhausting administrative remedies." *Rivernider*, 2019 WL 3816671, at *2. Courts are split on whether the policy statement is binding because it predates the FSA's changes to 18

6

Case 3:97-cr-03015-LTS-KEM   Document 93   Filed 07/06/20   Page 6 of 19

U.S.C. § 3582(c)(1)(A).  A number of district courts have concluded that Guideline § 1B1.13 cmt. n.1 does not restrain a court's assessment of whether extraordinary and compelling reasons exist to release a defendant.  *See, e.g.*, *United States v. Rodriguez*, No. CR17-00021, 2019 WL 6311388, at *7 (N.D. Cal. Nov. 25, 2019); *United States v. Urkevich*, No. CR03-37, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019); *United States v. Brown*, No. CR05-00227, 2019 WL 4942051, at *4 (S.D. Iowa Oct. 8, 2019); *United States v. Fox*, No. CR14-03, 2019 WL 3046086, at *3 (D. Me. July 11, 2019); *United States v. Beck*, No. CR13-186-6, 2019 WL 2716505, at *6 (M.D.N.C. June 28, 2019); *United States v. Cantu*, 423 F. Supp. 3d 345, 352 (S.D. Tex. 2019).  Other courts have concluded that extraordinary and compelling reasons exist only if they are included in the Guideline.  *See, e.g.*, *United States v. Lynn*, No. CR89-0072, 2019 WL 3805349, at *4 (S.D. Ala. Aug. 13, 2019).

As I have previously stated, I agree with those courts that have found that although the Guideline provides helpful guidance on what constitutes extraordinary and compelling reasons, it is not conclusive given the recent statutory changes.  *See United States v. Schmitt*, No. CR12-4076-LTS, 2020 WL 96904, at *3 (N.D. Iowa Jan. 8, 2020); *see also Rodriguez*, 2019 WL 6311388, at *7 (Congress knew that the BOP rarely granted compassionate release requests prior to the FSA, and the purpose of the FSA is to increase the number of compassionate release requests granted by allowing defendants to file motions in district courts directly even after the BOP denies their request); *Brown*, 2019 WL 4942051, at *3 (same).

## IV. DISCUSSION

### A. *Exhaustion of Administrative Remedies*

It is unclear when Wyatt submitted an administrative request for compassionate release to his warden because a copy of the request is not available.  However, the warden denied the request on April 13 and 17, 2020.  Doc. No. 84-1; Doc. No. 84-2.  The warden's letter of denial stated:

7

> According to the medical assessment performed by institutional medical staff it was determined that you do not qualify for a reduction in sentence. The reasons for this cited in the medical assessment is the determination that you can adequately function in a correctional institution, and that the Bureau of Prisons can appropriately treat your medical condition. Therefore, due to the aforementioned information your RIS request is denied.

Doc. No. 84-1; Doc. No. 84-2.

On April 28, 2020, Wyatt's counsel emailed and mailed to the warden another request for compassionate release. Doc. No. 84-3. The email based the request on the COVID-19 pandemic and Wyatt's health conditions. *See id.* Wyatt's counsel has not received a response. *See* Doc. No. 84 at 3. Wyatt filed his motion for compassionate release through counsel on June 12, 2020, more than 30 days after his counsel submitted an administrative request on his behalf. *See* Doc. No. 83. The Government does not contest that Wyatt has exhausted his administrative remedies as required by 18 U.S.C. § 3582(c)(1)(A). *See* Doc. No. 89-1 at 8–9.

### B. *Extraordinary and Compelling Reasons*

Wyatt argues that his poor health presents extraordinary and compelling reasons independent of the COVID-19 pandemic. Doc. No. 84 at 8. He argues that in light of the pandemic, his poor health conditions emphatically constitute extraordinary and compelling reasons. *Id.* He contends that he is at risk of contracting COVID-19 while he is incarcerated at Greenville FCI and his health conditions place him at high risk of serious illness if he were infected with it. *Id.* at 15. The Government does not address Wyatt's argument that his health conditions present extraordinary and compelling reasons independent of COVID-19. Nor does the Government dispute that Wyatt's medical conditions exist or place him at a high risk of serious illness if he were infected with COVID-19. Doc. No. 89-1 at 13. However, the Government argues that Wyatt is not eligible for compassionate release because his health conditions do not substantially diminish his ability to provide self-care within Greenville FCI. *Id.* at 14. The

8

Government argues that Wyatt's health issues are well-controlled and that the BOP has taken many steps to mitigate the threat of COVID-19 in its facilities. *Id*. at 4–7.

### 1. *Wyatt's Health Conditions*

Wyatt's health conditions could constitute extraordinary and compelling reasons even without considering COVID-19. Guideline § 1B1.13 cmt. n.1(B) provides that extraordinary and compelling reasons exist where a defendant is at least 65 years old, is experiencing a serious deterioration in physical health because of the aging process and has served at least 10 years or 75 percent of his term of imprisonment, whichever is less.[2] Wyatt is 76 years old and has served at least 10 years of his term of imprisonment. In addition, his medical records demonstrate that he is experiencing a serious deterioration in physical health because of the aging process.

Dr. Samantha Alonso prepared a report, at the request of Wyatt's counsel, summarizing Wyatt's medical records and giving her opinion on the risk COVID-19 poses to Wyatt. *See* Doc. No. 88-5. Dr. Alonso is an Assistant Professor at the Emory University School of Medicine. Doc. No. 88-6. Dr. Alonso wrote that Wyatt's current medical conditions are (1) severe coronary artery disease, (2) heart failure, (3) pleural effusion (fluid that builds up in the lung compartment that affects the lung's ability to expand and oxygenate blood), (4) moderate carotid artery stenosis, (5) gallbladder polyps, (6) type two diabetes mellitus, (7) essential hypertension, (8) hyperlipidemia, (9) blood loss anemia with anemia of chronic disease, (10) reflux disease and (11) benign prostatic hyperplasia.[3] Doc. No. 88-5 at 1–2. Dr. Alonso further wrote:

---

[2] The Government's argument that Wyatt cannot establish extraordinary and compelling reasons because his medical conditions have not substantially diminished his ability to provide self-care within the environment of a correctional facility is irrelevant here. *See* Doc. No. 89-1 at 14. Guideline § 1B1.13 cmt. n.1(B) does not contain this requirement.

[3] Medical records reflect that Wyatt has also been diagnosed with asthma (Doc. No. 84-7 at 74), deep vein thrombosis prophylaxis (Doc. No. 84-8 at 88), severe atheromatous disease (Doc. No.

In June 2019, Mr. Wyatt started exhibiting symptoms of nausea, vomiting, and general malaise. These symptoms may have been early warning signs of heart disease as just two months later in August 2019 he was hospitalized for pneumonia and found to have severe multi-vessel heart disease complicated by a type of heart attack resulting from the stress of a concurrent infection. Since August, Mr. Wyatt required five more hospitalizations in a span of seven months. After his open-heart surgery in September, he required a hospitalization for physical deconditioning and shortness of breath in October during which he needed a walker for assistance with ambulation. Though by November he no longer required the use of a walker, just one month later in December he was seen in clinic for cold-like symptoms; the day after which he was found unresponsive in his cell unit. The unresponsive episode was thought to be related to a coughing spell from pneumonia but he had yet another episode of unconsciousness early January 2020 requiring another hospitalization. In February, Mr. Wyatt developed cough and shortness of breath again and was found to have severely compromised oxygen levels due to a large pleural effusion (fluid accumulation in lung) probably in part due to new, significant heart failure with reduced ejection fraction (pump function). His heart's noted ejection fraction was 28% (normal > 55%), a significant change in function from just one month earlier. The fluid accumulation in his lung required a procedure to drain a total of 1.7 liters from his lung compartment, where there regularly should only be a few milliliters of fluid. The composition of the fluid raised concern for infection, and he underwent yet another course of antibiotic treatment for pneumonia. Chest imaging from March has shown that some of the fluid is already redeveloping in his lung, which raises concern his heart failure and uncontrolled hypertension is making fluid control difficult and may predict need for further future procedures and hospitalizations.

Heart failure can be progressive and difficult to control despite medical therapy. Of highest concern in Mr. Wyatt's case is the rapid decline of his heart function despite the cardiac surgery he underwent meant to address the coronary artery disease that likely contributed to his heart failure. If his pump function were not to improve within a few months of medical therapy, Mr. Wyatt would warrant life-sustaining measures including a cardiac defibrillator to help prevent development of life-threatening irregular heart rhythms. Included in his extensive cardiovascular disease is also his carotid artery stenosis. Given his multiple episodes of loss of

---

84-8 at 56), unstable angina pectoris (Doc. No. 84-8 at 19), triple vessel disease (Doc. No. 84-7 at 91) and chronic obstructive pulmonary disease (COPD) (Doc. No. 85 at 21).

consciousness, it is certainly possible his atherosclerotic disease is contributing to poor blood flow to the brain when acutely ill with a separate process, thereby contributing to loss of consciousness. This kind of disease also places him at risk for strokes and chronic vascular disease in the brain which may contribute to cognitive decline.

Mr. Wyatt's frequent hospitalizations with such severe complications imply a continuous downhill trajectory in health. Generally, when people, particularly the elderly, are hospitalized, they are at high risk for functional decline. Some such signs include weight loss and difficulties with activities of daily living. For one, Mr. Wyatt has had significant unintentional weight loss over the past year, as much as 30 pounds within a few months. Though he now appears to have recovered some of the weight, the unintentional weight loss along with his anemia and frequent pneumonias raise concern for possible underlying cancer. Along with his weight loss, his advanced age and several clinical notes documenting that he has run out of his medications or no-showed to clinic appointments raise concern about his cognitive function and ability to care for his activities of daily living. Though difficult to predict, with Mr. Wyatt's continued hospitalized with frequent pneumonias, loss of consciousness, and severe cardiovascular disease, it would not be surprising if he were to continue losing functionality from both progressive heart failure symptoms and physical debilitation from prolonged hospital stays. Once the decline begins, it is very difficult for an elderly person to return to their baseline functional status, which only puts than at risk for further complications.

*Id.* at 2–3.

The Government cites to two recent medical appointments in support of its assertion that Wyatt's health issues are stable and well-controlled. Doc. No. 89-1 at 1–16 (citing Doc. No. 89-2 at 2, 10). This ignores the thousands of pages of medical records demonstrating that, in the last year, Wyatt's health issues were neither stable nor well-controlled but instead dramatically worsened. The fact that Wyatt felt well at two appointments does not mean that he is stable. His medical records demonstrate that he has multiple uncurable, progressive diseases and that his condition has sharply and suddenly declined multiple times in the past year.

The Government also argues that Wyatt's health conditions are common to incarcerated individuals. *See* Doc. No. 89-1 at 14. However, the Government does not

11

provide a citation for that statement. The Government does cite a 2015 report finding that 40 percent of jail and prison inmates have one current chronic medical condition.[4] *See id.* A chronic medical condition is defined in the report as cancer, high blood pressure/hypertension, stroke-related problems, diabetes/high blood sugar, heart-related problems, kidney-related problems, arthritis/rheumatism, asthma and cirrhosis of the liver. Wyatt potentially fits into five of these categories. His medical records demonstrate he has high blood pressure, is at-risk of strokes because of his medical issues, suffers from diabetes, has extremely severe heart problems and suffers from asthma.

Wyatt is clearly experiencing a serious deterioration in physical health because of the aging process. Other district courts have found extraordinary and compelling reasons in similar situations. *See United States v. Clyne*, No. 1:16-CR-115-BLW, 2019 WL 3292349, at *2 (D. Idaho July 22, 2019) (defendant was 72 years old and experienced several heart attacks while incarcerated and had a pacemaker implanted, and could only walk with the aid of a walker); *United States v. Johns*, No. CR 91-392-TUC-CKJ, 2019 WL 2646663, at *3 (D. Ariz. June 27, 2019) (defendant was 81 years old and suffered from osteoporosis, osteoarthritis, severe heart disease, a stroke and peripheral vascular disease); *United States v. McGraw*, No. 2:02-cr-00018-LJM-CMM, 2019 WL 2059488, at *3–4 (S.D. Ind. May 9, 2019) (defendant was 72 years old, required a wheelchair and a portable oxygen machine and suffered from type two diabetes with peripheral neuropathy, hyperlipidemia, emphysema, chronic kidney disease stage II and chronic pain); *see also United States v. Conner*, No. CR07-4095-LTS, 2020 WL 3053368, at *4 (N.D. Iowa June 8, 2020) (defendant was 73 years old and suffering from type two diabetes mellitus, diabetic neuropathy, hypertension, stage three chronic kidney disease, heart failure, morbid obesity, COPD, severe arthritis and severe back pain).

---

[4] Laura M. Maruschak, Marcus Berzofsky and Jennifer Unangst, *Medical Problems of State and Federal Prisoners and Jail Inmates, 2011–12*, U.S. Dep't of Justice, Bureau of Justice Statistics (Feb. 2015), https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf.

Wyatt meets all of the requirements in Guideline § 1B1.13 cmt. n.1(B). He is 76 years old, has served at least 10 years in prison and is experiencing a serious deterioration in physical health because of the aging process. Thus, I find that Wyatt presents extraordinary and compelling reasons independent of COVID-19. However, I will also consider the additional factor of the COVID-19 pandemic and its impact on Wyatt.

### 2. *COVID-19 Pandemic*

There is no doubt that Wyatt is at an increased risk of serious illness or death if he were to contract COVID-19. The Centers for Disease Control and Prevention (CDC) lists categories of people with underlying medical conditions who might be at higher risk from severe illness from COVID-19.[5] Wyatt fits into at least five of these categories. He suffers from COPD, a number of serious heart conditions, type two diabetes mellitus, asthma and hypertension. Wyatt's age also places him at a high risk of serious illness or death from COVID-19. According to the CDC, 8 of 10 COVID-19 deaths reported in the United States have been in adults age 65 years old or older.[6]

Dr. Alonso gave the following medical opinion on Wyatt's health trajectory and COVID-19 risk:

> Mr. Wyatt is an elderly and medically fragile man with several incurable and progressive medical conditions, with high risk of recurrent hospitalizations and rapid decline in functionality. In addition to his many severe medical conditions that on their own carry a high mortality risk, current data from the CDC about the COVID-19 pandemic suggests Mr. Wyatt is also at higher risk of death or serious illness if infected with COVID-19. . . . In my medical opinion, Mr. Wyatt warrants consideration for compassionate release based on his complex, incurable, and most likely

---

[5] *People of Any Age with Underlying Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last visited June 30, 2020).

[6] *Older Adults*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last visited June 30, 2020).

13

Case 3:97-cr-03015-LTS-KEM   Document 93   Filed 07/06/20   Page 13 of 19

terminal medical problems. His advanced age, diabetes lower BMI (body mass index), and coronary artery disease are predictors of mortality for somebody with heart failure with reduced ejection faction. Though prognosis is difficult to predict, especially when dealing with non-cancer related diagnoses, his rapid deterioration in health with frequent readmissions to the hospital suggest very low likelihood that Mr. Wyatt will improve to any significant extent, but rather continue this debilitating downhill trajectory. Additionally, his clinical history and social circumstances place him at significant risk of succumbing to an acute illness such as COVI-19.

Doc. No. 88-5 at 3–4.

While I appreciate that the BOP has taken many measures to prevent the transmission of COVID-19 among its inmate population,[7] the virus has nonetheless spread through many BOP facilities. The BOP reported on May 1, 2020, that it had tested 2,700 out of the 146,000 inmates within the BOP system for COVID-19, with 70 percent of those tested being positive.[8] As of July 1, 2020, one inmates has tested positive for COVID-19 at Wyatt's facility, Greenville FCI.[9] That inmate has recovered. However, without knowing whether the BOP is actively testing inmates and staff members for COVID-19 at Greenville FCI, the lack of active confirmed cases does not mean that COVID-19 is not present at the facility. Nor does it mean there will not be a future outbreak at the facility. As the Government acknowledges, despite extensive measures

---

[7] According to the BOP's website, those measures have included limiting inmate movement within each facility and between facilities, suspending visits, suspending staff training and travel, screening staff and inmates for COVID-19 symptoms and modifying operations to maximum social distancing to the extent possible. *BOP Implementing Modified Operations*, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/covid19_status.jsp (last visited June 30, 2020).

[8] Bureau of Prisons, Twitter, (May 1, 2020, 8:03 AM), https://twitter.com/OfficialFBOP/status/1256207531820662785.

[9] *COVID-19 Cases*, Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited July 2, 2020).

14

to prevent transmission, more federal inmates will contract COVID-19 going forward. *See* Doc. No. 89-1 at 7.

Wyatt's release plan is to live in his brother's condominium in Leavenworth, Kansas. Doc. No. 88-9. The Government argues that Wyatt has not established that he would be less vulnerable to COVID-19 if he were released to that residence. Doc. No. 89-1 at 16. However, his comparative risk of contracting COVID-19 at Greenville FCI or at his brother's condominium does not impact the relevant question, which is whether Wyatt has established extraordinary and compelling reasons. As explained above, Wyatt can establish extraordinary and compelling reasons even without considering COVID-19 pandemic. Wyatt's COVID-19 risk adds to the extraordinary and compelling reasons found in his medical problems.

### C. *Section 3553(a) Factors and Danger to Community*

While Wyatt has shown extraordinary and compelling reasons for compassionate release, that does not end the inquiry. Guideline § 1B1.13(2) provides that compassionate release is appropriate only where "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)[.]" Section 3582(c)(1)(A) requires a court to consider the factors set forth in 18 U.S.C. § 3553(a) before granting a motion for compassionate release. Section 3553(a) requires that I consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; and

15

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for—

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines [issued by the Sentencing Commission . . .;]

(5) any pertinent policy statement [issued by the Sentencing Commission . . .']

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

Wyatt acknowledges the severity of his offenses and the aggravation in his criminal history. Doc. No. 84 at 16. However, he argues that § 3553(a) factors support his early release because he has served nearly 23 years in federal prison for his present offenses, most of which he has spent in a maximum-security prison. *Id.* He states that he has been discipline free since 2015. *Id.* (citing Doc. No. 88-8). He points to his BOP reentry plan, which states that his "interaction with staff and inmates is appropriate and no management concerns are noted at this time." *Id.* (quoting Doc. No. 88-7 at 2). He states that he worked within the BOP before his rapid decline in health last year. *Id.* at 17 (citing Doc. No. 88-7 at 1). He also argues that he is no longer a danger to the safety of the community due to his poor health. *Id.* at 16.

The Government argues that the § 3553(a) factors weigh strongly against Wyatt's release. Doc. No. 89-1 at 15. The Government points to Wyatt's extensive criminal history. *Id.* at 15–16 (citing Doc. No. 47 at ¶¶ 104–118). It also notes that Wyatt has violated probation and supervised release and has had his probation revoked. *Id.* at 16 (citing Doc. No. 47 at ¶¶ 104, 109, 114, 117). The Government states that Wyatt has failed to appear, absconded from supervision and escaped from a halfway house. *Id.*

(citing Doc. No. 47 at ¶¶ 109, 113, 116). The Government also argues that the nature and circumstances of Wyatt's present offenses are extremely aggravating and Wyatt traumatized his robbery victims. *Id.* (citing Doc. No. 47 at ¶¶ 36–37). The Government also points out that Wyatt attempted to escape from two jails while this case was pending and discussed planning to kill another federal inmate after escaping. *Id.* (citing Doc. No. 47 at ¶¶ 38–39).

I agree with the Government. Indeed, this is not a close call. The offenses for which Wyatt was sentenced in this case are extremely aggravating, as is his lengthy criminal history of being an armed bank robber. Wyatt pleaded guilty to committing numerous armed bank robberies during which he stole thousands of dollars. Wyatt argues that no violence was actually used during his bank robberies. *See* Doc. No. 92 at 12. This is a poor argument. Wyatt demonstrated that he was willing to commit violence when he threatened bank employees and brandished a weapon during his robberies. Those actions traumatized his robbery victims. Doc. No. 47 at ¶¶ 36–37. The fortuitous fact that his robberies did not result in any actual physical injuries is in no way mitigating.

Further, Wyatt's long history of committing crimes, including similar armed bank robberies, shows that the two-month spree underlying his present sentence was not an anomaly. In 1975, he was convicted of impersonating a federal officer and conspiracy to impersonate a federal officer in order to defraud two victims. *Id.* at ¶ 114. Less than three months after being transferred to a halfway house in 1979, he robbed a bank in Kansas. *Id.* at ¶¶ 114–115. Two weeks after he was released from custody on the Kansas bank robbery charge, he robbed another bank in Missouri. *Id.* at ¶ 116. Wyatt was sentenced in federal court to 18 years' imprisonment for the Missouri robbery. *Id.* Less than three months after he was released to a halfway house in 1988, he committed yet another bank robbery, this time in Wyoming. *Id.* at ¶ 117. In 1989, Wyatt was sentenced in federal court to 78 months' imprisonment. *Id.* Again, within months after being released from custody in 1997, he committed the present offenses and robbed another bank in Wisconsin. *Id.* at ¶ 118.

Wyatt also has a history of failing to appear or absconding. *Id.* at ¶¶ 109, 113, 116. During the pendency of this case, he attempted to escape from two different jails. *See id.* at ¶¶ 38–39. While planning his first escape attempt, he discussed killing another inmate after his escape.[10] *Id.* at ¶ 38. Wyatt attempts to argue that his escape attempts are not quite so aggravating because they occurred after he pleaded guilty.[11] Doc. No. 92 at 14. This argument is also poor. Wyatt's escape attempts showed a disregard for the law and an intent to avoid the consequences of his criminal actions. After considering all of the relevant factors, Judge Bennett (who was openly concerned about excessive prison sentences[12]) purposefully constructed a sentence in this case that would likely result in Wyatt spending the rest of his life in prison. As Judge Bennett stated at sentencing, Wyatt is "a menace and a danger to society."

Two factors do weigh somewhat in Wyatt's favor. First, he has largely maintained a mostly-clear disciplinary record while incarcerated. In 2013, he was sanctioned for possessing a dangerous weapon and possessing drugs/alcohol. Doc. No. 88-8 at 1. In 2015, he was sanctioned for possessing a dangerous weapon. *Id.* Second, Wyatt's poor health and ability to function may reduce the risk that he will commit additional crimes. However, those factors do not overcome his lifelong disregard for the law. Wyatt has either been committing bank robberies or incarcerated for bank robberies for the past 30

---

[10] Wyatt confuses his first escape attempt with his second. *See* Doc. No. 92 at 12. At his sentencing, another inmate testified that while planning his first escape attempt Wyatt discussed killing another inmate after they escaped together. Judge Bennett credited the inmate's testimony. After Wyatt's second escape attempt, officials found in Wyatt's belongings a list of names that were believed to be cooperators that another inmate wanted killed. Officials thought that Wyatt intended to kill the people listed after he escaped, but at sentencing it was confirmed that Wyatt had actually written down the names of people he heard other inmates discussing killing and turned over the names to the FBI.

[11] His first escape attempt was discovered on July 2, 1998. Doc. No. 47 at ¶ 38. Wyatt pleaded guilty on April 28, 1999. *Id.* at ¶ 15.

[12] *See, e.g.*, Mark Osler, Judge Mark W. Bennett, *A "Holocaust in Slow Motion?" America's Mass Incarceration and the Role of Discretion*, 7 DePaul J. for Soc. Just. 117 (2014).

years. While Wyatt's health situation may reduce the risk that he will commit more armed robberies, his history demonstrates that he will have difficulties with complying with the law and with the conditions of supervised release.

Releasing Wyatt now, with nine years still remaining on the lengthy sentence his sentencing judge deemed necessary, would undermine the need for the sentence imposed, including the need to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment. Granting release at this time likewise would fail to reflect Wyatt's lifelong disregard for the law and for the safety of others. While his current health situation is unfortunate, it does not justify releasing a mega-recidivist, armed criminal back into society long before he has completed his sentence. Having considered the factors set forth in 18 U.S.C. § 3553(a), I find that Wyatt is not entitled to compassionate release.

## V. CONCLUSION

For the foregoing reasons, Wyatt's motion (Doc. No. 83) for compassionate release is **denied**. The Clerk's office is directed to provide a copy of this order to the institution where Wyatt is incarcerated.

**IT IS SO ORDERED.**
**DATED** this 6th day of July, 2020.

_____
Leonard T. Strand, Chief Judge